## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

```
RYAN INTERNATIONAL AIRLINES,      )
INC.,                             )
                                  )
                 Plaintiff,       )    CIVIL ACTION
                                  )
v.                                )    No.  04-1024-MLB
                                  )
AIR LINE PILOTS ASSOCIATION,      )
INT'L,                            )
                                  )
                 Defendant.       )
──────────────────────────────────)
```

## MEMORANDUM AND ORDER

This case comes before the court on cross-motions for summary judgment. (Docs. 35, 46).  The matter has been fully briefed and is ripe for decision.  (Docs. 36, 47, 52, 53, 54, 55).

## I.   SUMMARY JUDGMENT STANDARD: FRCP 56

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.[1]  <u>Prenalta Corp. v. Colo. Interstate Gas Co.</u>, 944 F.2d 677, 684 (10th Cir. 1991).

## II.   FACTS AND PROCEDURAL HISTORY

Ryan International Airlines, Inc. (Ryan) is a common carrier by air engaged in interstate commerce and Air Line Pilots Association International (ALPA) is the "representative" of Ryan's pilots under the terms of the Railway Labor Act (RLA).  <u>See</u> 45 U.S.C. §§ 181; 151, First, Fourth, Sixth.  Under the RLA, the parties negotiated a collective bargaining agreement (CBA), which established a grievance-resolution process that ultimately requires arbitration by a Ryan-ALPA Pilots' System Board of Adjustment (System Board) pursuant to 45 U.S.C § 181. (Doc. 38.) The System Board is comprised of one representative each from Ryan and ALPA and a neutral arbitrator. (Doc. 38 at 44.)

In June 2002, ALPA filed a grievance against Ryan (Doc. 39, Jt. Exs. 2, 3.) The grievance submitted the issue to the System Board as "[w]hether [Ryan] violated the [CBA] by improperly administering the Reciprocity program, thus allowing Irish and British pilots to fly for [Ryan], while Ryan pilots are denied the opportunity to fly abroad? If so, what shall be the remedy." (Doc. 39, Jt. Ex. 3.)

---

[1] Even though the parties have filed cross-motions for summary judgment, the legal standard does not change.  <u>See</u> <u>United Wats, Inc. v. Cincinnati Ins. Co.</u>, 971 F. Supp. 1375, 1382 (D. Kan. 1997).  It remains this court's sole objective to discern whether there are any disputes of material fact, <u>see</u> <u>Harrison W. Corp. v. Gulf Oil Co.</u>, 662 F.2d 690, 692 (10th Cir. 1981), and the court will treat each motion separately.  <u>See</u> <u>Atl. Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1148 (10th Cir. 2000).

The grievance was heard by the System Board on February 6, 2003. (Doc. 39, Jt. Ex. 4.)  Professor Dennis Nolan sat on the Board as the neutral arbitrator.  (Doc. 39, Jt. Ex. 4.)  During opening statement, ALPA explained its position as to the appropriate remedy for Ryan's breach of the CBA:

> The remedy in this case is somewhat complicated.  It's our view there were 14 pilot jobs for a period of approximating six months.  The evidence will show in this case that although it might be difficult to pinpoint who exactly suffered harm as a result of this, it is certainly ascertainable.  The Union would ask the Arbitrator to retain jurisdiction so that the Union and the Company in the event of a favorable award to the Union would be able to make that ascertainment and calculate the amount of money damages owed to certain individuals.
> During the course of the evidence in this case, Mr. Nolan, it will become clear to you why that is difficult to just pick out 14 individuals who might have been harmed. But in any event, it's our position had the Company complied with the Letter of Agreement, we would have had 14 additional jobs for six months which we didn't have.

(Doc. 39, Jt. Ex. 4 at 8-9.)

Evidence presented by ALPA focused on Ryan's liability for 14 jobs and at only one point did a question appear to touch on Ryan's liability to more than the 14 pilots.  ALPA questioned Stephen Montgomery as to whether damages are ascertainable.  (Doc. 39, Jt. Ex. 4 at 27.)  Montgomery replied, "I think they are.  They're going to extend the [sic] more than 14 people because with other contracts coming on."  Id.  Counsel for ALPA then replied, "[L]et's limit it to this 14 in this circumstance here."  Id.

After the hearing, counsel for both parties submitted post-hearing briefs to Nolan.  ALPA's brief set out a request for remedy as follows:

> Accordingly, the Union respectfully requests that the System Board fashion a remedy in this case that will

-3-

> require the Company, in conjunction with Union
> representatives, to determine the identity of the 14 Ryan
> pilots who were denied foreign flying jobs.  The Company
> should also be required to identify the seat status of each
> such pilot as well as the exact duration of the domestic
> flying jobs the Company provided to JMC and Aer Lingus
> pilots during the fall-winter 2001-2002 flying season.

(Doc. 39, Jt. Ex. 6 at 15).

On May 16, 2003, the System Board issued its Opinion, sustaining

ALPA's grievance. (Doc. 40, Jt. Ex. 7.) The opinion presented ALPA's

position as follows:

> The Association asks the Board to craft a remedy that
> would require the parties to identify the 14 Ryan
> crewmembers who should have been offered foreign flying
> jobs and to make them whole for any losses.

(Doc. 40, Jt. Ex. 7 at 5).  The Opinion then set out its remedy and

award:

> C.   Remedy
>
> We conclude that Ryan did not fulfill its side of the
> Reciprocity bargain.  That breach of contract requires that
> it compensate any bargaining unit member who suffered as a
> result.
>
> That said, it will be necessary to determine just
> which pilots were injured by the breach and just what their
> injuries were. [ALPA] recognizes that remedial requirement.
> It asks for identification of the 14 individuals who should
> have been offered foreign "flight crew job opportunities"
> during the Summer of 2002 and for a determination of how
> much income they lost.  *We shall therefore direct the
> parties to negotiate over those matters, while retaining
> jurisdiction in the event they are unable to agree.*
>
> For their assistance, however, we note that all the
> usual contract law remedy rules apply, in particular the
> duty to mitigate.  The duty to mitigate damages requires an
> employee harmed by a contract breach to seek and accept
> suitable alternative work.  All earnings the employee
> has from the alternative work (or earnings that he or she
> should have had, given reasonable efforts) are deducted from
> the employer's liability.  [Ryan's] duty is to make the
> injured pilots "whole," not to provide them a windfall.
> Accordingly, each affected pilot's earnings from
> alternative work during the Summer of 2002 will reduce his

-4-

or her recovery, regardless whether those earnings came from Ryan or some other employer.

AWARD

The grievance is sustained. [Ryan] violated the [CBA] by not arranging for 14 Ryan crewmembers to be offered "flight crew job opportunities" by Aer Lingus and JMC during the Summer of 2002. It must therefore make affected Ryan crewmembers whole for any losses. Toward that objective, *we direct the parties to seek to identify the 14 employees who should have been offered flight crew job opportunities by those airlines and to determine their losses. If the parties are able to do so, [Ryan] shall reimburse those affected individuals for lost pay, less any alternative earnings they had or reasonably should have had during the appropriate period. If the parties are unable to reach agreement on those matters, they are directed to submit their remaining disputes to the System Board for a final determination.*

(Doc. 40, Jt. Ex. 7 at 9-10)(emphasis supplied).

The parties met on June 10, 2003, but were unable to reach an agreement on the appropriate methodology for identifying the pilots who were damaged. See Doc. 23, Ex. 6. Thereafter, on July 1, 2003, counsel for the parties exchanged correspondence concerning their respective positions. (Doc. 40.) Ryan focused on the need to identify 14 pilots who should have been offered job opportunities and stated that it would attempt to furnish the monetary damages for these individuals before the next hearing.[2] ALPA responded that it did not believe that the remedy should be limited to 14 pilots and stated that

---

[2] The next hearing was initially scheduled for July 8, 2003, but was later continued to August 8, 2003. See Doc. 23, Ex. 6 at 2. Ryan refers to the August 8, 2003 session in Washington as a "meeting" with the Arbitrator. (Doc. 1, ¶¶ 28, 30, 31.) ALPA refers to it as a "hearing." (Doc. 16, ¶ 27.) However it is characterized, the session was transcribed by a certified court reporter and a copy of the transcript has been provided. (Jt. Ex. 10.)

its counsel had made this clear to Ryan at the prior meeting.[3]   If Ryan's counsel replied, it is not in the record.

On August 8, 2003, the parties appeared in Washington, D.C., before Nolan regarding the remedial phase. (Jt. Ex. 10.) This hearing took place in front of Nolan only (without the other two members of the System Board) and witnesses were heard, but not sworn. (Jt. Ex. 10 at 6-7.) Neither party objected to this format. Nolan stated that the proceeding was "just a presentation of proposals." Id. ALPA stated that it was prepared to "present a scenario and a methodology for [Nolan's] consideration," referred to as a back-fill damage analysis, where it identified the 14 pilots who would have been employed in Europe and then identified individuals who would have moved into the positions vacated by those 14 individuals.

At the  beginning of cross-examination of ALPA's first witness, counsel for Ryan stated that "I think we need to point out for the record that this damage analysis has not been done by the company because we haven't gotten to the threshold question of identifying the individuals who in fact were damaged by the event. So we're not, by questioning and analyzing this, we're not agreeing that this is the methodology used." (Jt. Ex. at 44).  Ryan then stated its position during its opening statement to Nolan as follows:

> Obviously, the reason you're here, Professor Nolan, is we haven't agreed on a methodology for selecting the people who were damaged.  Ryan's reading of your decision is that our mission was to identify the 14 people who were damaged by the failure to provide the European jobs and trace what

---

[3] Other than the correspondence between the parties, the record is devoid of evidence as to what transpired during the June 10 meeting referenced in the correspondence or how ALPA's position was "made clear."

happened to them.

We have not done a damage analysis, as ALPA has done, simply because we have not yet identified the individuals involved. We believe there are three different methodologies of identifying those individuals.

* * *

So really, three different methodologies, the first two are variations on each, on the same central theme. To do anything else is purely speculative. I think the document that ALPA has introduced clearly shows that, to speculate who people made choices in terms of what they did, is simply impossible, far too speculative, and in fact, I think ALPA's failure, since they went into a damage analysis, to bring all of these people in, either through testimony or affidavit form, have them identify why they made the choices they made, is a clear indication of why it's speculative to choose the methodology that ALPA chose.

* * *

So, as I've stated, the company doesn't really have a damage analysis because we don't know how to do it yet, and we'll take that direction from you.

(Jt. Ex. 10 at 87-89.)

At the conclusion of the hearing, Nolan stated the following:

So in other words, even though we're going to proceed forward, and I will presumably receive briefs from you folks, I hope that you will not cease communicating with one another because, if you do go through that, for instance, if you were just, as a rough matter, to come up with the 14 people from the furlough list and figure out how much money they might be entitled to, if that gets reasonably close to what the union might get through its calculations, then perhaps the parties could successfully complete their own negotiations.

(Jt. Ex. 10 at 107-08.)

On November 7, 2003, the parties submitted post-hearing briefs to Nolan. (Doc. 23, Ex. 4.) Ryan restated its position that the May 16, 2003 Opinion issued by the System Board limited damages to only 14 pilots. (Doc. 41.) ALPA submitted to Nolan its contention that 42 pilots were damaged by the breach and requested an award based on its

-7-

back-fill analysis.  (Doc. 44.)

On December 7, 2003, Nolan, acting for the System Board, issued a Supplemental Opinion granting a damage award to ALPA based on information presented at the August hearing. (Doc. 45, Jt. Ex. 13.) Nolan determined ALPA properly sought damages for all affected employees and awarded damages for "all" pilots after noting that Ryan did not challenge ALPA's evidence.  Id. at 4.  By "all," Nolan evidently meant 42 pilots, not just the 14 who were the focus of the proceedings which culminated in the May 16, 2003 award.  Nolan concluded by ordering the parties to implement the award, *but he retained "jurisdiction to resolve any remedial matters on which they cannot agree."  Id.* at 5(emphasis supplied).

After the Supplemental Opinion was filed, both parties submitted letters to Nolan. In his December 11, 2003 letter, Ryan's attorney stated that he was "completely surprised by your going beyond what I understood to be the purpose of the hearing. . ." and that he assumed from Nolan's comments on the record that Ryan would have the opportunity at a later time to make its damage calculations. (Doc. 45, Jt. Ex. 14.) Interestingly, however, the letter does not refer to Nolan's decision that 42 pilots, rather than 14, were entitled to damages.  In his December 19, 2003 responsive letter, ALPA's attorney contended that Ryan was on notice that the damage issue would be decided at the August hearing. (Doc. 45, Jt. Ex. 15.)

On December 30, 2003, Nolan, again on behalf of the System Board, issued a Second Supplemental Opinion that reaffirmed the December 7 Supplemental Opinion and ordered Ryan to implement the damage award described therein. (Doc. 45, Jt. Ex. 17.)  In so doing, Nolan

considered and rejected Ryan's arguments regarding the way the dispute had been handled and that it had been blindsided and sandbagged.  He concluded:

> *That the Supplemental Award was correct does not, unfortunately, end this dispute.* As that Award recognized, there are some remaining loose ends involving mitigation by a few furloughed employees.  No doubt the Union would also consider any information the Company might provide it about the affected individuals or their actual damages.  With reasonable effort and some good will, the parties should be able to tie up those ends on their own.  If they cannot, however, *they are once again directed to present any lingering disputes to the System Board for a final resolution.*
>
> SECOND SUPPLEMENTAL AWARD
>
> The Supplemental Award properly adopted the Union's proposal to identify affected crewmembers and to calculate their injuries.  The Company is directed to implement that award, subject only to further negotiations over the mitigation efforts by furloughed pilots.  *If the parties cannot resolve those questions, they shall present their evidence to the System board as soon as possible for a final decision.*

Id. at 7(emphasis supplied).

Ryan then filed this action seeking to vacate both supplemental awards. (Doc. 1.)

## III. ANALYSIS

The scope of review of System Board awards under the RLA is among the narrowest known to the law and applies equally to all special boards created under authority of 45 U.S.C. § 153.  See Watts v. Union Pacific R.R., 796 F.2d 1240, 1243 (10th Cir. 1986)(quoting Denver & R.G.W.R. Co. v. Blackett, 538 F.2d 291, 293 (10th Cir. 1976)); Chernak v. Southwest Airlines Co., 778 F.2d 578, 580 (10th Cir. 1985).  Under the RLA, there are three grounds for review of a System Board award: (1) failure of the Board to comply with the requirements of the Act;

(2) failure of the Board to confine itself to the scope of the Board's jurisdiction; and (3) fraud or corruption by a member of the Board. 45 U.S.C. § 153 First (p), (q).

Ryan acknowledges that "there is no basis upon which the Board's Initial Award is likely to be overturned." (Doc. 47 at 12.) Ryan, however, urges this court to find that the arbitrator exceeded the scope of his jurisdiction and/or failed to comply with the Act by fashioning a remedy for twenty-eight additional pilots in the supplemental awards. Ryan contends that the Board's jurisdiction was limited by its decision in the initial award to fashioning a remedy for only 14 pilots because both the CBA and the RLA mandate that awards issued by the System Board are final and binding on the parties.[4] See 45 U.S.C. § 153 First(m); Doc. Jt. Ex. 1 at 45. "An arbitrator's award may be overturned as in excess of the Board's jurisdiction, only where the arbitration board's order does not draw its essence from the collective bargaining agreement, or its interpretation of the contract is wholly baseless and completely without reason." Robinson v. Union Pacific R.R., 245 F.3d 1188, 1193-94 (10th Cir. 2001). "As long as the arbitrator is even arguably construing or applying the contract, the arbitrators award must not be disturbed." Id.

Ryan also asserts that the common law doctrine of functus officio prevents the System Board from adding to the initial award. "When arbitrators have executed their award and declared their decision they

---

[4] Ryan has not asserted that the remedy provided in the supplemental awards is forbidden by the CBA or that the Board's interpretation of the CBA was either baseless or without reason.

are functus officio and have no power or authority to proceed further." <u>United Steelworkers of Am., AFL-CIO-CLC v. Ideal Cement Co., Div. of Ideal Basic Indus., Inc.</u>, 762 F.2d 837, 842 (10th Cir. 1985). "Courts have limited the doctrine to allow arbitrators 'to correct mistakes, complete awards which were not final, and clarify ambiguities.'" <u>Kennecott Utah Copper Corp. v. Becker</u>, 186 F.3d 1261, 1270 (10th Cir. 1999). In <u>Kennecott</u>, the Tenth Circuit extended the functus officio doctrine to federal common law governing review of labor-arbitration awards. <u>Id.</u> This doctrine was developed in order to prevent arbitrators from altering or adding to a final award. <u>Id.</u>

ALPA interprets the initial award as allowing a remedy for "all" of the pilots who were affected by the breach (presumably 42). But regardless of the parties' divergent interpretation of the scope of the initial award, the decision was not final. The opinion clearly concluded that a breach of the CBA occurred but, due to the complicated issue of identifying the injured parties and damages, the System Board expressly retained jurisdiction in the event that the parties were unable to determine those matters during negotiation. There is no question that no agreement was reached by the parties on that issue. "Where the award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not exhausted his function and it remains open to him for subsequent determination." <u>Colonial Penn Ins. Co. v. Omaha Indem. Co.</u>, 943 F.2d 327, 332 (3d Cir. 1991).

<u>Courier-Citizen Co. v. Boston Electrotypers Union No. 11, Intern. Printing & Graphic Communications Union of N. Am.</u>, 702 F.2d 273 (1st Cir. 1983), a case cited by Ryan to support its position, is similar

-11-

to this case. The initial award identified a breach of the CBA and awarded a remedy. However, the arbitrator was "unable to identify the most senior journeyman or to specify the amount of back pay to which that person would be entitled." Id. at 279. The first supplemental award, which identified the injured party and the amount of damages after a hearing, was a proper and necessary supplement or completion of the initial award since the company had not voluntarily implemented the initial award and the remedy had been incomplete. Id.

Here, even though the System Board acknowledged that 14 pilots were directly harmed by the violation, the initial award did not fully adjudicate the issue of remedy since the affected pilots and the amount of their damages could not be ascertained. Accordingly, the System Board properly retained jurisdiction to adjudicate the remainder of any issues submitted to it and the supplemental awards merely supplemented or completed the initial award.[5]

---

[5] Ryan asserts that ALPA's submission to the System Board did not encompass the remedy provided in the supplemental awards. (Doc. 47 at 19.) Ryan cites Courier-Citizen Co., 702 F.2d at 282, for the proposition that a subsequent arbitral award that awards damages to an employee whose rights were not raised in the first award must be vacated. However, the First Circuit's opinion does not stand for that proposition. Rather, the employee who was awarded damages in the second supplemental award received damages because he suffered a job loss as a result of the company's failure to comply with the initial and first supplemental award issued by the arbitrator. Id. at 280-82. Therefore, the First Circuit held that the second supplemental award must be vacated even though a decision to enforce such an award "would encourage voluntary compliance with an arbitrator's ruling." Id. at 282.

ALPA's grievance submitted to the System Board was broad. It asked whether Ryan breached the agreement and, if so, what is the appropriate remedy. (Doc. 39, Jt. Ex. 3.) The submission did not expressly limit the inquiry to only 14 pilots.

Ryan also asserts that the August 8 hearing violated its due process rights by failing to give proper notice of the purpose of the hearing. A violation of due process is not a separate ground for review of System Board awards. See Discovery Order, Doc. 25 at 5-7;

-12-

## IV.   ATTORNEY'S FEES

ALPA seeks attorney's fees pursuant to 45 U.S.C. § 153 First(p). Only employees can seek review of an arbitration award pursuant to 45 U.S.C. § 153 First(p). This case was brought pursuant to 45 U.S.C. § 153 First(q). "Unlike Section 3 First (p), Congress did not see fit to provide for the recovery of reasonable attorneys' fees in suits for review under Section 3 First (q)." Sheehan v. Union Pacific R. Co., 576 F.2d 854, 858 (10th Cir.), rev'd on other grounds, 439 U.S. 89 (1978). "[A]n award of attorneys' fees in a case such as this was not intended by Congress." Id.

---

Kinross v. Utah Ry., 362 F.3d 658 (10th Cir. 2004).  Ryan, however, claims that it did not receive proper notice as required by 45 U.S.C. 153 First(j).  Ryan did not raise this objection before or during the hearing.  Even though the hearing was informal, Ryan still bears the ordinary responsibility to preserve any claim of error.  Brotherhood of Railway, Airline, & S.S. Clerks, etc. v. St. Louis S. R. Co., 676 F.2d 132, 136 (5th Cir. 1982).

Finally, Ryan argues that the absence of the other two System Board members violated the CBA.  Ryan again failed to object.

Ryan's arguments are "clearly [] afterthought[s], brought forward at the last possible moment to undo the administrative proceedings." Id. (quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 36 (1952)).  Although the court is somewhat puzzled by the manner in which the proceedings before the arbitrator were handled, the court cannot invalidate awards without a proper basis.  Ryan had the opportunity to object to the absence of the whole System Board at the August 8 hearing, the alleged lack of proper notice, the scope of the supplemental hearing and the unsworn testimony of witnesses at the hearing.  By failing to object, Ryan failed to preserve those issues for review by this court, assuming the issues would be reviewable had timely objections been made.

Similarly, while Nolan could have given a clearer explanation of the reason he expanded the number of pilots from 14 to 42, this court has no authority to review the merits of the dispute, even if the decision is ambiguous.  Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).  Nolan was acting within the scope of the System Board's jurisdiction and the initial award clearly was not final.  Ryan's confusion over the nature of the initial award and the effect of the subsequent proceedings on the initial award, if confusion it was, cannot be corrected by this court.

ALPA also asserts that attorney's fees are appropriate when a party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons."  <u>Alyeska Pipeline Service Co. v. Wilderness Society</u>, 421 U.S. 240, 258-59(1975).  Ryan's conduct does not warrant an award of attorney's fees in this case.

## V.   CONCLUSION

Ryan's motion for summary judgment is DENIED and ALPA's motion is GRANTED.  ALPA's motion for attorney's fees is DENIED.  The parties are ordered to comply with the initial and both Supplemental Awards. Any remaining disputes shall be submitted to the System Board and the case is remanded for that purpose.  The clerk is directed to enter judgment accordingly.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

-14-

IT IS SO ORDERED.

Dated this __22nd__ day of February 2005, at Wichita, Kansas.


                                    s/ Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE